ESTATE OF ELIZABETH M. LEE, DECEASED, RHOADY R. LEE, SR., EXECUTOR, AND RHOADY R. LEE, SR., INDIVIDUALLY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8782–75.    Filed March 2, 1978.

*Wayne C. Booth,* for the petitioners.
*Darrell D. Hallett,* for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in the Federal estate and gift taxes of the Estate of Elizabeth M. Lee in the amounts $1,924,902.71 and $87,075 respectively. Concessions were made by the parties. The two issues that remain for our decision relate to the estate tax deficiency. They are:

(1) What was the fair market value on September 14, 1971, of decedent's interest in the 4,000 shares of common stock and the 50,000 shares of preferred stock in F. W. Palin Trucking, Inc., which shares were owned by her and her husband as community property under the law of Washington State.

(2) What was the fair market value on September 14, 1971, of the 25,000 shares of preferred stock in F. W. Palin Trucking, Inc., which decedent devised to charity.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners are the Estate of Elizabeth M. Lee (hereinafter referred to as Mrs. Lee) and Rhoady R. Lee, Sr. (hereinafter referred to as Mr. Lee), Mrs. Lee's husband and the executor of her estate. Mr. Lee resided in Medina, Wash., at the time the

petition was filed in this case. Mr. Lee filed the Federal estate tax return for Mrs. Lee's estate with the Internal Revenue Service Center in Ogden, Utah.

Mrs. Lee died on September 14, 1971, at the age of 67 years. She was survived by her husband, Mr. Lee, and three adult children, Patricia Lee Burke, Rhoady R. Lee, Jr., and Sheila E. Lee (Stanford). Under Washington law Mr. and Mrs. Lee constituted a marital community. All of their property at the time of Mrs. Lee's death was community property.

The major portion of the property in Mrs. Lee's estate was her one-half interest in the 4,000 shares of common stock and the 50,000 shares of preferred stock in F. W. Palin Trucking, Inc. (hereinafter referred to as Palin Trucking), which was used as an estate planning vehicle. Mrs. Lee devised her one-half interest in the preferred stock to eight different Catholic charities and her one-half interest in the common stock to Mr. Lee.

The planning which culminated in these bequests began in June 1969 when Mr. Lee's personal attorney, Wayne C. Booth, advised Mr. Lee that estate tax problems would be encountered if Mr. and Mrs. Lee retained their extensive realty and close corporation stock holdings in the same form until death. It was suggested by Mr. Booth that Mr. Lee consider establishing a testamentary generation-skipping trust and a corporation to function as a holding company for the various property and stock interests of the Lees. Mr. Booth recommended that a public offering of a substantial portion of the holding company stock be made after its formation. Mr. Lee took no action, however, on these proposals.

In the spring of 1971 Mr. Lee discussed estate planning with employees of Touche Ross & Co., a national certified public accounting firm. By letter dated April 26, 1971, Mr. T. B. Tilford of Touche Ross & Co. suggested that the Lees transfer their personally held real estate investments and their interests in Lakeside Gravel Co., Midlakes Construction Co., and Red Samm Mining Co. to their controlled corporation, Palin Trucking, whose assets and businesses were then principally related to the operation of the trucking business.

As a result of these discussions, the Lees undertook actions to implement the reorganization of Palin Trucking. At that time the issued and outstanding stock consisted of 3,000 shares. Mr.

Lee, his son Rhoady R. Lee, Jr., and one Phil Godfrey each held 1,000 shares. Rhoady R. Lee, Jr., orally agreed to sell his 1,000 shares for $67,500 to Mr. and Mrs. Lee and to vote for any reorganization which they might propose. The sales agreement with modifications was consummated by Rhoady R. Lee, Jr., and Mr. Lee in 1974, years after Mrs. Lee's death. On May 15, 1971, the 1,000 shares owned by Phil Godfrey were purchased by Palin Trucking for $67,500. The terms of payment for Phil Godfrey's stock were $5,000 to be paid on April 12, 1972, and $1,000 or more per month beginning June 20, 1972, with interest of 7 percent on the principal balance.

On May 13, 1971, shortly prior to the purchase of Godfrey's stock, the articles of incorporation of Palin Trucking were amended to provide in pertinent part as follows:

The corporation shall be authorized to issue two classes of stock with the designation, preferences, limitations and relative rights as follows:

*Common Stock:* Five thousand (5,000) shares of common stock having a par value of ten dollars ($10.00) per share. *Voting rights:* Each share of common stock shall entitle the owner and holder thereof to one vote in the management and affairs of the corporation.

*Preferred Stock:* Fifty thousand (50,000) shares of preferred stock having a par value of one hundred dollars ($100.00) per share. *Voting rights:* Each preferred share shall entitle the owner and holder thereof to one vote on any corporate action involving amendment of the Articles of Incorporation, merger or dissolution, but shall not entitle the owner and holder thereof to any vote on election of the board of directors or the general policy or management of the corporation.

*Dividends:* No dividends shall be declared or paid on any common stock in any fiscal year of the corporation until the dividend of seven percent (7%) of the par value thereof has first been declared and paid on all of the issued and outstanding preferred stock. After payment of such preferred dividend, dividends may be declared and paid to the holders of the common stock in such amounts as the board of directors may determine but no additional dividend will be paid on preferred stock in said year. Preferred stock dividends shall not be cumulative.

*Dissolution:* On dissolution of the corporation the owners of preferred stock shall have a preference to distribution of assets of the corporation to the extent of an amount equal to two hundred percent (200%) of the par value of the preferred stock, issued and outstanding, and the balance of the assets shall be distributed to the owners of the issued and outstanding common stock.

*Redemption:* The board of directors may from time to time call any or all of the preferred stock for redemption by the corporation and continue to exercise such calls until all of the preferred stock is redeemed. Notice of such call shall be given to the shareholders of record by certified mail directed to the address of such shareholder as shown by the corporate records stating the date the stock will be redeemed. After said date the shareholder of the share or shares

called for redemption shall have no further rights except to receive payment of the redemption price without interest. As a condition to receiving such payment, the owner and holder of the shares called for redemption must surrender the share certificates representing the stock redeemed for cancellation. In the event only a portion of the preferred stock is called for redemption and there is more than one preferred shareholder, any partial redemption shall be made prorata [sic]. The redemption price shall be Two Hundred Dollars ($200.00) per share.

The right of the board of directors to redeem preferred stock shall be subject to the restrictions provided in RCW 23A.16.090.

In summary, the amended articles provided for two classes of stock. The 5,000 shares of common stock had voting control of the board of directors. The 50,000 shares of preferred stock were entitled under the terms of the articles to vote only on amendment to the articles of incorporation, merger, or dissolution. The preferred stock was entitled to a noncumulative 7-percent dividend before dividends could be paid on the common stock in any given year. In dissolution the preferred stock was entitled to $200 per share before the common stock could receive any distribution. The preferred stock also was subject to redemption at $200 per share.

On May 19, 1971, after this amendment to the articles, Palin Trucking transferred the 3,000 shares of unissued common stock and the entire 50,000 shares of preferred stock to Mr. Lee. Mr. Lee then held an aggregate of 4,000 shares of common stock and 50,000 shares of preferred stock as community property with Mrs. Lee. In exchange Mr. Lee transferred the following items of property: (1) A contract receivable from the shareholders of Lakeside Gravel Co., Inc., (2) 200 shares of common stock in Lakeside Gravel Co., Inc., (3) 260 shares of common stock in Midlakes Construction & Development Co., (4) 7,428 shares of common stock in Red Samm Mining Co., Inc., (5) one-half interest in Circle River Ranch estate joint venture, (6) 10 acres identified as Lake Sammamish High property, (7) Second and Stewart property in downtown Seattle, (8) E. Burns-Harrocks, Issaquah property (20 acres), (9) Cave Creek property located in Phoenix, Ariz.

Pursuant to a resolution of the board of directors of Palin Trucking dated May 20, 1971, Mr. Lee by statutory warranty deeds dated May 21, 1971, also transferred the following parcels of real property to Palin Trucking: (1) Property located on 116th Avenue N.E., Bellevue, (2) property located at Sunset-Factoria,

Bellevue, (3) Cedar Blocks real estate contract, and (4) Cooper Lake property. These tracts of undeveloped real property had been held by Mr. and Mrs. Lee for many years for investment purposes.

In May 1971, Mrs. Lee executed a codicil to a will she had previously executed on March 5, 1971. In this codicil, Mrs. Lee stated in part as follows:

> My husband and I and our children are financially interested in substantial and diverse businesses and properties and have been working toward a reorganization of our business interests to the end of having a centralized management, coordination and control of said businesses; and as a part of the comprehensive plan of reorganization, it is the intent and purpose of my husband to transfer the majority of our property to one business entity; namely, F. W. Palin Trucking Company.

In this codicil Mrs. Lee devised her one-half interest in the common and preferred stock in Palin Trucking to Mr. Lee in trust.

The foregoing will and codicil were revoked on August 6, 1971, when Mrs. Lee executed the last will and testament which was effective upon her death on September 14, 1971. In this will she bequeathed her one-half interest in their 4,000 shares of Palin Trucking common stock to Mr. Lee and her one-half interest in their 50,000 shares of Palin Trucking preferred stock to eight Catholic charities as follows:

| | |
|---|---|
| The DePaul and Mt. St. Vincent Nursing Center | Ten percent (10%) |
| Archbishop of Seattle for St. Joseph's Carmelite Monastery | Fifteen percent (15%) |
| Forest Ridge Convent | Fifteen percent (15%) |
| St. Edward's Seminary, King County, Wash | Fifteen percent (15%) |
| Sisters of Providence, Providence Hospital Convent, Seattle, Wash | Ten percent (10%) |
| Sacred Heart Catholic Church, Bellevue, Wash | Ten percent (10%) |
| Our Lady of Perpetual Help Church, Scottsdale, Ariz | Ten percent (10%) |
| Seattle University | Fifteen percent (15%) |

The bequest to the charities listed above qualifies as a charitable deduction from the gross estate of Mrs. Lee.

On the Federal estate tax return filed for Mrs. Lee's estate on July 14, 1972, the 50,000 shares of preferred stock were listed as

having a value of $10 million and the 4,000 shares of common stock were listed as having a value of $40,000. A deduction in the amount of $5 million was claimed for the bequest of 25,000 preferred shares to the Catholic charities. After excluding the community one-half interest of Mr. Lee as $5 million for the preferred stock and $20,000 for the common stock, the taxable estate on the return reflected the amount of $20,000 for decedent's interest in Palin Trucking.

The parties have agreed, however, that the aggregate value of Palin Trucking was much less than the value assigned to it on the estate tax return. The fair market value of the assets of Palin Trucking as of September 14, 1971, after taking into consideration the liabilities of the corporation, was as follows:

| Asset | Valuation |
|---|---|
| Bellevue—116th | $370,000 |
| Lake Sammamish—10 acres | |
| Newport Way, Bellevue | 80,000 |
| Eastgate-Factoria | 2,371,000 |
| Eastgate—N. Frontage Road | 91,000 |
| Corner Stewart, Pine and 2nd, Seattle | 845,000 |
| Issaquah (rural) | 60,000 |
| Bellevue—N.E. 24th | 26,000 |
| Cave Creek property | 100,000 |
| Contract receivable from shareholders | |
| of Lakeside Gravel Co., Inc | 110,000 |
| 200 Shares of common stock of | |
| Lakeside Gravel Co., Inc | 790,000 |
| 260 Shares of common stock of Midlakes | |
| Construction & Development Co. | 100,000 |
| 7,428 Shares of common stock of | |
| Red Samm Mining Co., Inc | 181,200 |
| Circle River Ranch interest | 75,000 |
| Cedar Block contract | 32,730 |
| Trucking business | 250,000 |
| | 5,481,930 |

For the 4-year period ending December 31, 1971, Palin Trucking had declining after tax earnings: $72,320 in 1968, $46,517 in 1969, $37,510 in 1970, and $21,788 in 1971. The corporation had never paid any dividends. Mr. Lee drew from Palin Trucking a salary of $32,500 for the year 1971, and $15,000

for the year 1972. He drew no salary from the corporation for the years 1973 through 1976.

As of September 14, 1971, and after that time, substantially all of the parcels of real property owned by Palin Trucking were not used in connection with the operation of the trucking business. The trucking business consisted primarily of contract hauling of gravel for Lakeside Gravel Co., Inc., and was operated from offices rented from Lakeside.

As of 1971, Mr. Lee had plans to develop the principal parcels of real estate which were transferred to Palin Trucking in the recapitalization of May 1971. For example, Mr. Lee had architectural plans drawn up for the development of the 96 acres of property located at the Factoria Interchange of I–90. These plans called for construction of motels, hotels, restaurants, retail shops, banks, and shopping marts on the property. Similarly Mr. Lee had plans to later construct a hotel, soft goods mart, and shops on the property located at Second and Steward.

Following Mrs. Lee's death and as late as 1972, Mr. Lee also considered the possibility of merging Palin Trucking with Lakeside Sand & Gravel Co. and Red Samm Mining Co., but no merger was attempted. In March 1972, Palin Trucking did guarantee a loan made to Lakeside Sand & Gravel Co. in the amount of $1 million from the Bank of California, and Palin Trucking agreed in connection with the guarantee of this loan that it would not sell or encumber any of its assets without the prior consent of the bank for a period of 10 years or during the term that the loan was outstanding.

In September 1974, the assets and business relating to the trucking operations of Palin Trucking were sold to Lakeside Industries for a cash payment of $231,215.35 and an assumption by Lakeside Industries of liabilities owed by Palin Trucking in the amount of $162,910.25. At the time of this transaction, Lakeside Industries was a joint venture comprised of the following companies: Washington Asphalt Co., Pacific Sand & Gravel Co., Red Samm Mining Co., Sea-Tac Asphalt Co., and RLJ, Inc. All of these companies except Red Samm Mining Co. were wholly owned by Rhoady R. Lee, Jr.

On November 6, 1974, Patricia Burke and Sheila Lee Stanford, Mr. Lee's daughters, caused an action to be brought by Lakeside Gravel Co., Inc., against Mr. Lee, Mr. and Mrs. Rhoady R. Lee, Jr., Palin Trucking, Touche Ross & Co., and five corporations

wholly owned by Rhoady R. Lee, Jr., RLJ, Inc., Pacific Sand & Gravel Co., Sea-Tac Asphalt Co., Washington Asphalt Co., and Red Samm Mining Co., Inc. This lawsuit was settled in July 1975. Under the settlement Patricia Burke and Sheila Lee Stanford formed a new corporation, known as Lakeside Gravel Co. To this new corporation were transferred the sand, gravel, and concrete business, and several of the parcels of real property formerly owned by Lakeside Gravel Co., Inc. The former corporation, Lakeside Gravel Co., Inc., changed its name to Eastside Ventures, and retained some of the real property formerly owned by Lakeside Gravel Co., Inc., and Lakeside Gravel Co.'s interest in Lakeside Industries. Two hundred shares of Eastside Ventures stock were owned by Palin Trucking and 320 shares were owned by Rhoady R. Lee, Jr.

Between the date of Mrs. Lee's death on September 14, 1971, and April 1977, no distribution of assets was made with respect to the 50,000 shares of preferred stock. During this period the charities investigated the prospect of receiving a distribution from Palin Trucking. Attorneys for the charities met with Mr. Lee on February 6, 1973, but the issue of distributions to charities was not resolved at that time. Mr. Lee proposed a redemption plan to which the charities eventually agreed by a letter dated September 12, 1974, but this plan was not carried out. Under the plan the assets of Palin Trucking were to be distributed in liquidation and then contributed to the previously dormant Madeira Corte Corp. The plan was aimed primarily at increasing the basis of the assets to minimize taxable gain at the corporate level. The then dormant Madeira Corte Corp. was to be reorganized so that Mr. Lee and the charities would occupy essentially the same status as they held in Palin Trucking. Mr. Lee then proposed to raise capital to develop the realty and to redeem the preferred stock of the charities from the funds generated.

These plans were frustrated by several circumstances. Until 1975, Mr. Lee was unable to work out the appropriate highway bridge improvements necessary to the development of some of Palin Trucking's holdings. Mr. Lee's borrowing capacity was hindered by the lawsuit initiated against him by his daughters and by the issuance of the notice of deficiencies by the Internal Revenue Service on July 11, 1975. The energy crisis and building by competitors also adversely affected the plans.

As an alternative to the plans initially proposed, Mr. Lee and the charities agreed to each take a one-half interest in the assets of Palin Trucking in liquidation with Mr. Lee granted an exclusive 5-year management agreement. Under the management agreement the charities granted to Mr. Lee power to sell, encumber, develop, and otherwise deal with all of the assets to be distributed by Palin Trucking in liquidation. Mr. Lee agreed to act without compensation for his management and personally borrowed $350,000 to pay corporate debts so the assets could be distributed. Pursuant to a shareholders consent adopted August 6, 1976, Palin Trucking was liquidated with a distribution of all its assets in which the charities collectively and Mr. Lee individually took an undivided one-half interest.

### ULTIMATE FINDINGS OF FACT

(1) The fair market value on September 14, 1971, of decedent's interest in the 4,000 shares of common stock and the 50,000 shares of preferred stock in Palin Trucking which were owned by her and her husband as community property under the law of Washington State was $2,192,772.

(2) The fair market value on September 14, 1971, of the 25,000 shares of preferred stock in Palin Trucking which decedent devised to charity was $1,973,494.80.

### OPINION

The issues for our decision concern the valuation of the common and preferred stock in Palin Trucking for purposes of determining the gross estate and taxable estate of decedent. Palin Trucking was a closely held corporation consisting primarily of realty held for subsequent development. At the time of Mrs. Lee's death on September 14, 1971, she and Mr. Lee owned as community property 4,000 of the 5,000 outstanding shares of the common stock and all 50,000 shares of the preferred stock of Palin Trucking. The remaining 1,000 shares of common stock were owned by Rhoady R. Lee, Jr. The parties have stipulated that the net asset value of Palin Trucking was $5,481,930. Mrs. Lee devised her interest in the common stock to Mr. Lee and her interest in the preferred stock to eight Catholic charities. Subsequently, Mr. Lee purchased the 1,000 shares of common stock from Rhoady R. Lee, Jr. Thereafter Palin Trucking was liquidated and Mr. Lee individu-

ally and the Catholic charities collectively each took an undivided one-half interest in the properties of Palin Trucking. Mr. Lee also was granted an exclusive 5-year management power over all of the assets. This case requires a determination of the fair market value on September 14, 1971, of Mrs. Lee's interest in the common and preferred stock which is includable in her estate pursuant to section 2031,[1] and the fair market value of the 25,000 shares of preferred stock which is deductible as a charitable bequest under section 2055.

Fair market value is defined in the regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031–1(b), Estate Tax Regs. Section 2031(b) provides that, in the absence of sales establishing market value, the value of unlisted stock and securities "shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." In the instant case, however, the peculiar nature of Palin Trucking and its securities precludes comparison to other corporations. Consequently, our analysis is limited to other indicia of fair market value.

For these circumstances the regulations provide that "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors" are to be considered to value stock of a closely-held corporation. Sec. 20.2031–2(f), Estate Tax Regs. Other relevant factors include:

The good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; * * * However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. [Sec. 20.2031–2(f), Estate Tax Regs.]

After reviewing the evidence of record, we conclude that the most pertinent factors in valuing the Palin Trucking stock are its net asset value, the specific rights under the preferred and

---

[1] Unless specified otherwise, section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.

common stock, and the degree of control of the business represented by the blocks of stock to be valued.

Reliance on the net asset value as the starting point here is justified for several reasons. First, the assets of Palin Trucking were almost exclusively undeveloped realty. The actual trucking operation accounted for less than 5 percent of the stipulated net asset value of Palin Trucking. Furthermore, the realty offered no immediate prospects for taxable income to the corporation or dividends to the shareholders. Under these circumstances factors such as prospective earning power, dividend paying capacity, goodwill of the business, and economic outlook in the particular industry have little relevance. Such factors apply primarily to a corporation which is engaged in active business operations. But at the time of Mrs. Lee's death, Palin Trucking was primarily a holding company. In this situation to the extent the enumerated factors have any significance, they are largely subsumed in a valuation of the assets of Palin Trucking.

The origin of much of the controversy in this case lies in the peculiar nature of the stock of Palin Trucking. The preferred shares entitled its owners to a noncumulative, nonparticipating dividend of 7 percent of the $100 par value only in those years in which it was authorized by the board of directors. The voting rights of the preferred shareholders were limited to issues of liquidation and reorganization. The common shareholders were entitled to control the management of Palin Trucking and to elect the board of directors. No dividends could be paid to the common shareholders in any year unless the preferred shareholders were first paid their 7-percent dividend, and under Washington law[2] unless the value of the assets of Palin Trucking after the distribution would be greater than the amount of $200 per share to which the preferred shareholders were entitled in preference over the common shareholders in liquidation or redemption. The common shareholders were entitled to no return unless the assets valued at $5,481,930 on September 14, 1971, appreciated to more than $10 million. In light of this unusual set of circumstances, the degree of control of the corporation represented by the block of stock to be valued becomes a particularly pertinent factor.

---

[2] Wash. Rev. Code sec. 23A.08.420 (1974).

Respondent contends that the value of Mrs. Lee's interest which is includable in her estate was $2,421,868.50 and that the value of the charitable bequest of the preferred stock was nominal or, alternatively, was no more than $986,748. Respondent arrived at this conclusion by starting with the net asset value of Palin Trucking which was $5,481,930. He reduced this amount by $100,000 to account for the 20 percent common stock interest held by Rhoady R. Lee, Jr. Respondent further adjusted the net asset value by lowering it 10 percent to reflect the lack of marketability of the Palin Trucking stock. Respondent valued as a block Mr. and Mrs. Lee's combined interest in 4,000 shares of common stock and 50,000 shares of preferred stock at the resulting figure of $4,843,737 and determined that one-half of that amount was includable in Mrs. Lee's estate.

Respondent determined that the value of the 25,000 shares of preferred stock which Mrs. Lee devised to charity was nominal, however, since as a block the charities had no power to effect any dividend, redemption, or liquidation distribution. Any distribution to the charities was unlikely to occur in the foreseeable future, respondent contends, since it was in the interest of common shareholders to postpone such distributions indefinitely to obtain the ultimate benefit of all asset appreciation above $10 million. Respondent therefore contends that the value of the preferred stock was so speculative as to be nominal. Respondent argues in the alternative that, if the 25,000 shares preferred stock are determined by this Court to have a substantial value, such value does not exceed $986,748, i.e., the valuation made by respondent's expert witness.

Petitioner, on the other hand, argues in part that the common and preferred shares of Palin Trucking should be valued on a per share basis with each share valued as a unit and with no consideration given to controlling or minority interest factors. The common shares were of nominal value, petitioner contends, since, although they had control of the corporation, the common shareholders had no reasonable anticipation of a monetary return in the foreseeable future because all appreciation up to $10 million in net asset value would accrue to the benefit of the preferred shareholders. For this reason, the preferred shares should be assigned most of the net asset value of the corporation. Petitioner attempts to buttress this position by arguing that the preferred shareholders had the power to compel liquidation, that

Palin Trucking was destined for early liquidation, and that attempts by the common shareholders to block it would be a breach of fiduciary duty.

We have considered the various intricacies of the arguments advanced by respondent and petitioner. Those arguments in which we found merit have been incorporated as considerations in our valuations of the Palin Trucking stock. For the most part, however, we have charted a middle ground between the valuation methods and conclusions advanced by the parties.

We first address the valuation of Mrs. Lee's interest in the common and preferred stock to be included in her gross estate. We agree with respondent's contention that Mrs. Lee's interest in the common and preferred stock should be valued as a block for this purpose.[3] The common and preferred stock each had negative features which would detract from their fair market value if sold separately. The preferred shares entitled their owner to a claim in liquidation or redemption to all the assets then owned plus all subsequent appreciation up to $10 million. The common shareholders had no prospect of realizing any monetary return from corporation assets for some time, yet had control over their management. In combination, however, the preferred and common shares entitled their owners to all the positive benefits while negating the detriments. As experts for both respondent and petitioner testified, the normal approach would be to market the preferred and common shares as a block. Consequently, we think determination of fair market value should also be based on that approach.

The next question which arises is the size of the block to be valued. Respondent relies on a valuation of the aggregate of Mr. and Mrs. Lee's combined interest in their 4,000 shares of common and 50,000 shares of preferred stock. Respondent contends that this approach is required by the basis treatment afforded the surviving spouse's interest under section 1014[4] and

---

[3]Petitioner's contention that the stock should be valued on a per share basis without consideration of the controlling interest is without merit. The "degree of control of the business represented by the block of stock to be valued" is specified by the regulations as a factor to be weighed in valuing stock. Sec. 20.2031–2(f), Estate Tax Regs. Control is a factor which the hypothetical willing buyer and willing seller would consider in determining a fair price for a block of stock.

[4]SEC. 1014. BASIS OF PROPERTY ACQUIRED FROM A DECEDENT.

(a) IN GENERAL.—Except as otherwise provided in this section, the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent shall, if not sold, exchanged, or otherwise disposed of before the decedent's death by such person, be the fair market value of the property at the date of the decedent's death, or, in the case of an election

the nature of a community property interest in Washington. We disagree.

Respondent misinterprets the holding of *In re Estate of Patton,* 6 Wash. App. 464, 494 P.2d 238 (1972), as defining each spouse's community property interest to consist "of an undivided one-half interest of the whole of all community property." In fact, *In re Estate of Patton* actually holds that each spouse's community property interest consists of an undivided one-half interest in each item of community property.[5] Under respondent's misinterpretation, valuation of the aggregate community interest might[6] be appropriate since the surviving spouse's community interest could be satisfied by property other than the interest in Palin Trucking so long as the value received by the survivor was equal to one-half of the value of the aggregate estate. Under these circumstances it is conceivable that the community interest in Palin Trucking might be conveyed in its entirety and therefore should be valued as a block of 4,000 shares

---

under either section 2032 or section 811(j) of the Internal Revenue Code of 1939 where the decedent died after October 21, 1942, its value at the applicable valuation date prescribed by those sections.

(b) PROPERTY ACQUIRED FROM THE DECEDENT.—For purposes of subsection (a), the following property shall be considered to have been acquired from or to have passed from the decedent:

\* \* \* \* \* \* \*

(6) In the case of decedents dying after December 31, 1947, property which represents the surviving spouse's one-half share of community property held by the decedent and the surviving spouse under the community property laws of any State, Territory, or possession of the United States or any foreign country, if at least one-half of the whole of the community interest in such property was includible in determining the value of the decedent's gross estate under chapter 11 of subtitle B (section 2001 and following, relating to estate tax) or section 811 of the Internal Revenue Code of 1939.

[5] *In re Estate of Patton* was the first case to address this issue in Washington. The issue and holding as formulated in that case are informative:

"What has never been made explicit, however, is whether under our community property law the equal interests of husband and wife in the community property must always be manifested as a collection of undivided half interests in each specific *item* of community property, or whether it is sufficient to protect the equal interests of the spouses if each is guaranteed at least an undivided one-half interest in the community property when viewed in the *aggregate. In re Estate of Yiatchos,* 60 Wash.2d 179, 373 P.2d 125 (1962); *Yiatchos v. Yiatchos,* 376 U.S. 306 \* \* \* (1964). [494 P.2d 238, 243]

\* \* \* \* \* \* \*

"We hold that one spouse may not designate whole interests in community property to pass by testamentary disposition to named beneficiaries, and therefore we must reject appellants' contention that such devises of whole interests in community property may be enforced so long as the other spouse's community interest is not impaired—that is, as long as it can be shown that the other spouse is guaranteed at least a one-half interest in the community estate when it is viewed in the aggregate. [494 P.2d 238, 245]"

This view has been adhered to in subsequent cases. *In re Estate of Bonness,* 13 Wash. App. 299, 535 P.2d 823, 829 (1975); *LaHue v. Keystone Investment Co.,* 6 Wash. App. 765, 496 P.2d 343, 350 (1972).

[6] We purposefully use the word might in this sentence. We reach no conclusion here on whether valuation as a minority interest would also be appropriate if State law did not grant the surviving spouse a one-half interest in each item in the marital community.

of common and 50,000 shares of preferred. Since Washington law prohibits such a devise, however, each spouse's undivided one-half interest in each item should be valued as such. We believe the block of 4,000 shares of common and 50,000 shares of preferred constituted an item of community property in which Mr. and Mrs. Lee each had an undivided one-half interest which was equivalent to each having a separate interest in a block of 2,000 shares of common and 25,000 shares of preferred.[7] Although in the aggregate the marital community held a majority interest in the stock of Palin Trucking, for estate tax valuation purposes each held a separate minority interest.[8] See *Sundquist v. United States*, an unreported case (E.D. Wash. 1974, 34 AFTR2d 74–6337, 74–2 USTC par. 13,035); supplemental opinion disposing of other issues 35 AFTR2d 75–1606 (1975).

We find nothing in the language of section 1014(b)(6) requiring a different approach. Section 1014(b)(6) provides a fair market value basis for "property which represents the surviving spouse's one-half share of community property held by the decedent and the surviving spouse under the community property laws of any state, * * * if at least one-half of the whole of the community interest in such property was includible in determining the value of the decedent's gross estate."[9] The provisions of section 1014(b)(6) can be harmonized with the valuation of the decedent's interest in specific items by determining that the value of the survivor's corresponding interest in the specific items will equal the value determined for inclusion in the decedent's gross estate. The language of section 1014(b)(6) does not dictate that valuation should be on the aggregate level. It only requires that "one-half of the whole of

---

[7] If the "item" theory of community property adopted in Washington State were carried to its literal extreme, one might argue that it should be applied to each share of stock with the decedent's beneficiary and the surviving spouse each taking an undivided one-half interest therein. Indeed, if there were only one share of a specified stock that would be the result. If the marital community holds a block of fungible shares, however, it is appropriate to consider the block as one item with the surviving spouse taking one-half of the shares. In any event, this is the factual predicate in the instant case.

[8] To support his method respondent also relied on Washington probate procedure. Upon the death of one spouse, the "whole of the community property [is] subject to probate administration for all purposes of this title, including the payment of obligations and debts of the community, the award in lieu of homestead, the allowance for family support, and any other matter for which the community property would be responsible or liable if the decedent were living." Wash. Rev. Code sec. 11.02.070 (1974). This being as it may, it does not alter the determinative fact that under Washington law a spouse had the power to devise only his or her one-half interest in each specific item.

[9] In the case of a decedent dying after Dec. 31, 1976, sec. 1014 does not apply to any property for which a carryover basis is provided by sec. 1023. Sec. 1014(d).

the community interest" must have been "includible in determining the value of the decedent's gross estate." Valuation as a one-half interest in each item appears consonant with the overall statutory scheme.[10]

Accordingly, we value Mrs. Lee's interest in Palin Trucking as a block of 2,000 shares of common and 25,000 shares of preferred stock. This block was a minority interest. A buyer would

---

[10] We have examined the legislative history of the applicable estate tax provisions and have found nothing to indicate that under the circumstances of the instant case valuation as a majority interest is required. Prior to 1942, estates in community property States could exclude one-half of the community property in determining tax liability. No such benefit existed in common law States. To remedy this inequity Congress enacted sec. 811(e)(2), I.R.C. 1939, which under certain circumstances included in the estate the entire interest held as community property by the decedent and surviving spouse. In 1948 Congress repealed sec. 811(e)(2), reinstated the former rule for community property, and enacted provisions for a marital deduction for property not held as community property.

In explaining the reasons for repeal of sec. 811(e)(2), the legislative history cites inter alia the hardships it caused for those holding community property:

"In 1942 the Congress attempted to provide more nearly equal results under the estate and gift taxes. The estate tax amendments of that year provide that the entire community property be included in the decedent's gross estate, except such portion as can be 'shown to have been received as compensation for personal services actually rendered by the surviving spouse or derived originally from such compensation or from separate property of the surviving spouse.' Under this rule, the entire community property is taxable to the first spouse to die unless some portion of the community is economically attributable to the survivor. However, the 1942 amendments further provide that regardless of which spouse was responsible for the acquisition of the community, at least one-half of the value of the community is includible in the decedent's gross estate. The basis for this rule is the fact that rights to at least one-half the community are transferred on the death of either spouse. The rule is necessary, since the share of the spouse dying first may not be transferred to the surviving spouse and the community assets may not be economically attributable to the decedent spouse. In such a case, if no tax were imposed, the property would avoid the estate tax for one generation.

\*          \*          \*          \*          \*          \*          \*

"Unfortunately, a number of problems have arisen under the 1942 amendments. Most important of these is the fact that geographical equalization has not been realized in a typical situation. Furthermore, the problem of determining the economic contribution of the surviving spouse to the community has resulted in an extremely difficult problem of "tracing." *Severe hardship also results where, because the entire community property is includible in his gross estate, the estate tax of the decedent is larger than the community property subject to his power of disposition. For example, if a decedent is economically responsible for the entire community this average tax rate on his estate may exceed 50 percent. However, only half of the community is subject to his power of disposition. Thus the share of the community already belonging to his spouse may be required to bear part of the tax although the spouse does not inherit any property under State law.* [S.Rept. 1013, 80th Cong., 2d Sess. (1948), 1948–1 C.B. 285, 304 (Emphasis added.)]."

An inequity analogous to that which Congress sought to correct would arise in the instant case if we were to adopt the method of valuation advocated by respondent. Under respondent's method an individual would be taxed on value inherent in property over which he has no power of disposition.

We are not unmindful that a major reason for the 1948 legislation was to minimize differences between the estate tax treatment in common law and community property estates. The holding in this case may run against that goal by recognizing distinctions in methods of valuation of property. Such a result is nonetheless required by the nature of the community property law in Washington State. In fact, despite the attempt to achieve equality, the legislative history recognizes "that complete equalization of the estate and gift taxes can not be achieved because of the inherent differences between community property and noncommunity property." S. Rept. 1013, 80th Cong., 2d Sess.(1948), 1948–1 C.B. 285, 305.

recognize that control of the corporation lay in the 60 percent of the common shares held 40 percent by Mr. Lee and 20 percent by Rhoady R. Lee, Jr. Despite lack of control the holder of Mrs. Lee's interest would be entitled as a minimum, however, to one-half of the asset value up to $10 million in liquidation or redemption of the preferred stock and 40 percent of any appreciation thereafter by right of her common stock ownership. In the event no liquidation or redemption occurred, she would be entitled to a 7-percent nonparticipating, noncumulative dividend on her preferred stock, if declared by the board of directors, and 40 percent of the dividend declared to common shares beyond the dividends to the preferred shares. After weighing the testimony of the expert witnesses and the arguments of the parties, we conclude that the fair market value of Mrs. Lee's interest was equal to 40 percent of the net asset value of Palin Trucking. This translates into a dollar value of $2,192,772.

The second issue for our decision is the value of the 25,000 preferred shares which Mrs. Lee bequeathed to charities. This value can best be determined by contrasting the rights embodied in 25,000 preferred shares with the rights embodied in Mrs. Lee's entire interest. The block of 25,000 shares was still, of course, a minority interest which lacked control of corporate operations and was without the power to force dividend, liquidation, or redemption distributions. To the extent that Mrs. Lee's interest, including the 40-percent common stock ownership, may have had some input in corporate management, this right was lost in the 25,000 preferred shares standing alone. The 25,000 preferred shares standing alone also lost the right to receive in liquidation asset appreciation beyond $200 per preferred share, should it occur, and the right to participate in dividend distributions, if declared, beyond the noncumulative, nonparticipating 7 percent of par value. We do not conclude, however, that the 25,000 preferred shares were of nominal value.[11] The preferred shares

[11] We reject respondent's argument that the 25,000 shares had nominal value. Although we appreciate respondent's concern that a charitable deduction should not be allowed where the substance and form of the transactions may preclude a meaningful distribution to charity, see, e.g., *Commissioner v. Sternberger's Estate*, 348 U.S. 187 (1955); *Humes v. United States*, 276 U.S. 487 (1928), we do not feel the facts of the instant case present such a situation. Under our valuation analysis we feel that the charities received the benefit of the bulk of Mrs. Lee's interest in Palin Trucking. This view is coincidentally consistent with subsequent events: Palin Trucking was liquidated and the charities collectively took an undivided one-half interest in the assets. Mr. Lee took the remaining undivided one-half interest and a 5-year right to manage the property without remuneration.

had preference in liquidation or redemption up to a net asset value of $10 million which was nearly twice the September 14, 1971, net asset value of Palin Trucking. The common shareholders were entitled to no distribution until the corporation had sufficient assets to meet the $10 million value. This potential return to common shareholders was speculative and could be anticipated to occur, if at all, only many years later. Under these circumstances it is difficult to ascertain the fair market value of the 25,000 preferred shares. Valuing the entire 50,000 shares of Palin Trucking preferred stock, the experts testifying for the parties arrived at the widely disparate aggregate values of $4,300,000 and $1,973,495. After considering the evidence and the arguments of the parties, we conclude that the value of the 25,000 shares standing alone was 10 percent less than the value of Mrs. Lee's entire interest in Palin Trucking. Accordingly, we hold that the value of the 25,000 preferred shares bequeathed to the charities was $1,973,494.80.

To reflect concessions by the parties and our conclusions on the disputed issues,

*Decision will be entered under Rule 155.*