ESTATE OF RAY A. FORD, DECEASED, JACK F. FORD AND RICHARD A. FORD, PERSONAL REPRESENTATIVES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ford v. Commissioner
Docket No. 5086-92
United States Tax Court
T.C. Memo 1993-580; 1993 Tax Ct. Memo LEXIS 595; 66 T.C.M. (CCH) 1507; December 8, 1993, Filed *595 Decision will be entered under Rule 155. For petitioners: James W. R. Brown and Thomas R. Brown. For respondent: Albert B. Kerkhove. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined a $ 666,287 deficiency in petitioner's Federal estate tax. [1] *596 The sole issue for decision is the fair market value of the stock owned by Ray A. Ford (decedent) at the date of his death in each of five closely held corporations. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Decedent died testate on April 3, 1988 (the valuation date). Petitioner is the estate of the decedent (the estate). Jack F. Ford and Richard A. Ford, personal representatives of the estate, resided in Omaha, Nebraska, at the time the petition was filed. At the date of his death, decedent owned the following stock interests, the values of which are at issue in this case: Number of
Percentage of Total
Company
Shares Held
Shares Outstanding
Ford's Mercantile Warehouses Co.
198
6.86
Ford Bros. Real Estate Co.
264
36.41
R.A. Ford Dodge Real Estate Co.
285
41.42
Ford Bros. Van & Storage Co.
548
92.41
Ford Storage & Moving Co.
214
74.56
*597 At and before decedent's death, these five companies were engaged in the following activity or held the following properties. Ford Storage & Moving Co. (Ford Moving) operated a transfer and storage business that decedent had commenced in 1915. Ford's Mercantile Warehouses Co. (Ford Mercantile), Ford Bros. Real Estate Co. (Ford Real Estate), and R.A. Ford Dodge Real Estate Co. (Ford Dodge) owned certain real properties located in Omaha which they leased to Ford Moving for use in its business. Ford Bros. Van & Storage Co. (Ford Van) owned certain transportation equipment which it leased to Ford Moving for use in its business. Hereinafter, these five companies will sometimes be referred to collectively as the Ford companies. Ford Moving's transfer and storage business involved storing and distributing its customers' products, storing household goods, performing local moving and cartage in the Omaha area, and long-distance hauling of household goods. On the valuation date, the assets of Ford Moving included 36.19 percent of the stock of Ford Mercantile. The operation of Ford Moving's transfer and storage business was divided into two main components: (1) the commercial division, *598 headed by Jack F. Ford, decedent's son, who had been employed there over 40 years at decedent's death, and (2) the household goods division, headed by another son of decedent, Richard A. Ford, who had joined the business after World War II. The commercial division of Ford Moving handled food products, cigarettes, paper goods, agricultural chemicals, and power equipment products. On the valuation date, the commercial division operated out of a warehouse at 7402 L Street, which had been leased from Ford Mercantile for a term of eight years beginning January 1, 1987. It also utilized space for its operations in certain older, downtown buildings owned by and leased from Ford Mercantile, Ford Real Estate, and Ford Dodge. Under the terms of the lease for the 7402 L Street warehouse, Ford Moving, as lessee, paid all taxes, insurance, utilities, and repair expenses for the premises. Ford Moving also leased space for its commercial division from an unrelated party in a single story, high-ceilinged warehouse in Omaha. Although Ford Moving had 72 commercial warehouse customers, its two largest customers were American Honda Motor Co. (Honda) and the Kellogg Company (Kellogg). In 1987, *599 Ford Moving agreed to make available for Kellogg's products 60,000 square feet of the warehouse located at 7402 L Street that it was leasing from Ford Mercantile. Ford Moving also warehoused and distributed Honda products, such as motorcycles, lawn mowers, all terrain vehicles, and power equipment. This operation was conducted in space leased from an unrelated party. Due to changes in the market, Honda wound down its relationship with Ford Moving between October 1987 and July 1988. Honda, however, was obligated to continue paying rent for the leased space until February 1989 and therefore made clear that it expected Ford Moving to mitigate that obligation by obtaining other accounts. The clients of the household goods division of Ford Moving consisted of approximately 150 individuals and 50 moving and storage companies. The household goods division transported household goods, either by doing the work itself or by arranging for cartage, for which it received a commission. Customers of Ford Moving also stored household goods for periods ranging from 30 days to several years. Ford Moving undertook performance of contracts entered into by Ford Van with Allied Van Lines and the *600 Department of Defense under which Ford Van agreed to move and store household goods. Ford Moving's household goods division operated out of three multistory warehouses located at 10th and Jones Streets (Jones Street warehouses), which were leased from Ford Mercantile. On the valuation date, the assets of Ford Mercantile consisted almost entirely of cash, amounts due from related entities, municipal bonds, real estate, and some warehouse equipment. The real estate owned by Ford Mercantile consisted in part of the Jones Street warehouses. Those buildings were located in a congested downtown warehouse district, were dependent on elevators to move goods, did not permit high stacking of goods, and restricted the use of mechanical equipment for handling goods. Consequently, the warehouses owned by Ford Mercantile were not well suited to the needs of Ford Moving's commercial customers for the storage and handling of goods. On the valuation date, Ford Mercantile was leasing these warehouses to Ford Moving for use in the latter's transfer and storage business. Ford Mercantile also owned a two story office/warehouse at 7402 L Street that it had acquired in 1986 and a single story warehouse *601 at 7300 L Street that it had acquired in 1987. [3] These facilities had been purchased to respond to the needs of Ford Moving's customers. They better accommodated transportation equipment, afforded off-street parking, enabled use of large warehouse handling equipment, and permitted palletization of stored goods, which then could be stacked high. The two L Street facilities were required to meet the demands of Ford Moving's customers for expeditious and accurate handling of incoming and outgoing shipments of commercial goods. On the valuation date, Ford Mercantile was leasing the warehouse at 7402 L Street to Ford Moving for use in its business and was leasing the warehouse at 7300 L Street to an unrelated party. For fiscal years 1983 through 1988, virtually all Ford Mercantile's income consisted of rent and interest. *602 On the valuation date, Ford Real Estate held assets consisting almost entirely of cash, amounts due from related entities, securities, real estate, and some warehouse equipment. These assets included a $ 55,000 receivable from Ford Mercantile, as well as 9.53 percent of the stock of Ford Mercantile. For fiscal years 1983 through 1988, virtually all Ford Real Estate's income consisted of rent and interest. On the valuation date, Ford Real Estate's real property, consisting of one warehouse, was being leased and used by Ford Moving in operating its business. On the valuation date, Ford Dodge held assets consisting almost exclusively of cash, amounts due from related entities, securities, real estate, and some warehouse equipment. Among these assets were municipal bonds, a loan of $ 155,000 to Ford Mercantile, and 20.94 percent of the stock of Ford Mercantile. The real property owned by Ford Dodge consisted of a multistory warehouse located at 1024 Dodge Street and a warehouse located at 102-110 North 11th Street. On the valuation date, both warehouses were leased by Ford Moving for use in its business. For fiscal years 1983 through 1988, virtually all the income of Ford Dodge *603 consisted of rent and interest. On the valuation date, the assets of Ford Van consisted almost exclusively of cash, amounts due from related entities, securities, and equipment of the type used in the transfer and storage business. The securities consisted mainly of municipal bonds and 14.70 percent of the stock of Ford Mercantile. Ford Van's equipment consisted primarily of trucks, tractors, trailers, and automobiles that were being leased on the valuation date to Ford Moving for use in its transfer and storage business. Ford Van had an agency agreement with Allied Van Lines for the moving and storage of household goods. Ford Van also had a contract with the Department of Defense for the storage of household goods and related services. The Department of Defense contract called for goods to be stored over periods of 36 to 48 months. Ford Van did not perform directly either the Allied Van Lines agency agreement or the Department of Defense contract. Rather, as noted above, Ford Moving undertook performance under those contracts. For fiscal years 1983 through 1988, virtually all Ford Van's income consisted of rent, interest, and gain from the sale of certain assets. The following *604 table summarizes decedent's stock ownership in the Ford companies and the stockholdings of each Ford company in the other Ford companies as of the valuation date: Decedent's
Percentage
Percentage
Interest in
Company
Interest
Ford Mercantile
Ford Storage & Moving Co.
74.56
36.19
Ford's Mercantile Warehouses Co.
6.86
N/A Ford Bros. Real Estate Co.
36.41
9.53
R.A. Ford Dodge Real Estate Co.
41.42
20.94
Ford Bros. Van & Storage Co.
92.41
14.70
The Ford companies never paid any dividends. In years prior to his death, decedent had made gifts of some of his stock in the Ford companies. OPINION Property includable in a decedent's gross estate generally is to be valued as of the date of decedent's death. [4] *605 Sec. 2031. [5] The issue we must decide is the fair market value of decedent's stockholdings in each of the Ford companies as of April 3, 1988, the date of his death. Petitioner bears the burden of demonstrating error in respondent's determination. Rule 142(a). Valuation of stock for tax purposes is a question of fact. Estate of Goodall v. Commissioner, 391 F.2d 775, 786-787 (8th Cir. 1968), affg. on this issue T.C. Memo. 1965-154; Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). The determination of the value of closely held stock is a matter of judgment, rather than of mathematics. Hamm v. Commissioner, supra at 940. Moreover, since valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific testimony, provided that it is within the range of figures which properly may be deduced from the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), *606 affg. T.C. Memo. 1974-285; Hamm v. Commissioner, supra at 939-940. The regulations define fair market value for purposes of the Federal estate tax as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.20311(b), Estate Tax Regs. In the case of unlisted stock, the best criteria of fair market value are arm's-length sales in the ordinary course of business within a reasonable time before or after the valuation date. Estate of Andrews v. Commissioner, supra at 940. In the instant case, however, the record does not disclose any such sales of the stock at issue; the only transactions involving that stock which are part of the record are gifts by decedent. [6]
*607 Where the value of unlisted stock cannot be determined from actual sale prices, section 2031(b) provides that value is to be determined by taking into consideration the value of stock in corporations listed on an exchange that are engaged in the same or similar business, [7] as well as all other factors bearing on value. The factors we must consider are those that an informed buyer and seller would take into account. Hamm v. Commissioner, supra at 938. Section 20.2031-2(f), Estate Tax Regs., lists some of those factors, including the company's net worth, prospective earning power, dividend-earning capacity, goodwill, the economic outlook for its industry, its position in the industry, its management, the degree of control represented by the block of stock to be valued, and nonoperating assets to the extent not otherwise considered. See also Arc Realty Co. v. Commissioner, 295 F.2d 98, 103 (8th Cir. 1961), affg. on this issue 34 T.C. 484 (1960). *608 There is, however, no fixed formula for applying the foregoing factors. See Estate of Goodall v. Commissioner, supra at 786; O'Malley v. Ames, 197 F.2d 256, 258 (8th Cir. 1952). The regulations provide, and we have held, that the weight to be given the various factors in arriving at fair market value depends upon the facts of each case. Estate of Andrews v. Commissioner, supra at 940-941; sec. 20.2031-2(f), Estate Tax Regs. As the trier of fact, we have broad discretion in assigning the weight to accord to the various factors and in selecting a method of valuation. Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue T.C. Memo. 1978-191; Hamm v. Commissioner, supra at 941. Nonetheless, primary consideration is generally given to earnings in valuing the stock of an operating company, while asset values are generally accorded the greatest weight in valuing the stock of a holding company. Levenson's Estate v. Commissioner, 282 F.2d 581, 586 (3d Cir. 1960), *609 remanding on other grounds T.C. Memo. 1959-120. Section 5 of Rev. Rul. 59-60, 1959-1 C.B. 237, 242, which we have recognized "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value", Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990), [8] states: In general, the appraiser will accord primary consideration to earnings when valuing stocks of companies which sell products or services to the public; conversely, in the investment or holding type of company, the appraiser may accord the greatest weight to the assets underlying the security to be valued.
*610 As is customary in valuation cases, the parties have relied extensively on the opinions of their respective experts to support their respective views on the fair market value of the stock of each of the Ford companies under the willing buyer-willing seller standard. We evaluate the expert opinion evidence in light of the qualifications of the experts and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by the formulae and opinions proffered by expert witnesses, especially when they are contrary to our judgment. Instead, we may reach a decision on value based on our own analysis of all the evidence in the record. Silverman v. Commissioner, 538 F.2d at 933; Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Hamm v. Commissioner, 325 F.2d at 940-941; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). *611 Where experts offer divergent estimates of fair market value, we will decide what weight to give those estimates by examining the factors used by the experts to arrive at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such an opinion. Parker v. Commissioner, supra at 562. Furthermore, we may reject the opinion of an expert witness in its entirety. Palmer v. Commissioner, supra at 1310; Parker v. Commissioner, supra at 562-565. Before turning to our consideration of the divergent expert opinions in this case, we restate the Court's view that questions of fair market value, like those that are at issue here, are generally more properly resolved through the give and take of settlement negotiations by the parties, rather than adjudication. Buffalo Tool & Die Mfg. Co. v. Commissioner, supra at 451. In *612 the absence of such a resolution in the present case, we are left to decide the fair market value of the stock at issue. In so doing, we will determine what weight to give to the conflicting expert opinions advocated by the parties. Petitioner's Expert Report
Petitioner contends that respondent's determination of the fair market value of the closely held stock of each of the Ford companies is excessive and that a lower value is appropriate in each instance. In support of those lower values, petitioner offers the report and testimony of its expert, Dr. Jerome F. Sherman, an Associate Professor of Finance at Creighton University. We note that petitioner's expert is not a member of any appraisal society or association. Nor is he a full-time business appraiser. Moreover, it is significant that petitioner's expert conceded at trial that his report contained various errors that were drawn to his attention by both respondent and the Court, indicating that his report was, at a minimum, carelessly prepared. We also find it noteworthy that petitioner's expert opinion of the value of the stock at issue was lower than that claimed on petitioner's estate tax return. A valuation *613 stated on a tax return constitutes an admission, which can be overcome only by cogent evidence that it is wrong. Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Mooneyham v. Commissioner, T.C. Memo. 1991-178; Estate of McGill v. Commissioner, T.C. Memo. 1984-292. For the reasons set forth below, petitioner's expert report does not rise to the level of cogent proof. [9]
Petitioner's expert valued the stock of each corporation at issue on the basis of a weighted average of historic book value and historic earnings. He attributed *614 25 percent of the stock value to book value and 75 percent to a weighted multiple of earnings or cash flow. Dr. Sherman used historic cash flow (earnings plus depreciation) in the case of Ford Mercantile, Ford Dodge, and Ford Real Estate and earnings (net income) in the case of Ford Van and Ford Moving. To arrive at his weighted multiple of earnings or cash flow, Dr. Sherman took the amount of each of the Ford companies' earnings or cash flow for the five years immediately preceding decedent's death and weighted that amount in reverse chronological order, with the most recent year being given the greatest weight and the earliest year being given the smallest weight. These amounts were then multiplied by a factor of 10 in the case of Ford Mercantile, Ford Dodge, and Ford Real Estate and by a factor of 12 in the case of Ford Moving and Ford Van. [10]
*615 Respondent has raised numerous objections to the method used by petitioner's expert in determining the fair market value of petitioner's stockholdings in each of the five Ford companies and to his opinions of each such value. We agree with respondent that defects in the methodology used by petitioner's expert render it incapable of yielding persuasive determinations of fair market value for the stock at issue. We shall now highlight some of those deficiencies. Petitioner's expert acknowledged at trial that there is a difference between an operating company and a holding company. He admitted during his testimony that Ford Mercantile, Ford Real Estate, Ford Dodge, and Ford Van are holding companies. His expert report characterized Ford Moving as an operating company. Nonetheless, petitioner's expert used essentially the same formula for valuing both the Ford operating company and the Ford holding companies, with only the minor variations described above. He thus disregarded the well-established valuation principle that, in valuing the stock of a holding company, the greatest weight generally is accorded to net asset value. Instead, in valuing the stock of each of the Ford companies, *616 including the four holding companies, he utilized the approach ordinarily employed in valuing an operating company, namely, giving primary importance to earnings. Levenson's Estate v. Commissioner, 282 F.2d at 586. Furthermore, as respondent's expert demonstrated, the bulk of the assets of Ford Moving were nonoperating investments, and thus even Ford Moving was a blend of an operating company and a holding company. Petitioner's expert did not even attempt to separate the operating and nonoperating portions of Ford Moving for valuation purposes, as did respondent's expert. Petitioner's expert therefore failed to give appropriate weight to asset values in arriving at his opinion of the fair market value for the Ford Moving stock owned by decedent on the valuation date. We also note that petitioner's expert did not explain in his report the reasons for deciding to use his weighted average valuation formula. Rather, he merely stated in his report that "The valuation of a corporation is based upon 75% of a multiple of earnings and 25% of book value." Petitioner's expert did not set forth the derivation of those percentages or why the relative weights *617 of the factors he selected should remain the same regardless of the type of corporation being valued. Nor was any independent corroboration offered for the method of valuation used by petitioner's expert. See Parker v. Commissioner, 86 T.C. at 564. Petitioner's expert also did not explain why he declined to consider the other factors enumerated in the regulations and Rev. Rul. 59-60 in arriving at his valuation. We have in the past declined to accept valuations based simply on mechanical formulae which assign arbitrary weights to various factors. Estate of Bennett v. Commissioner, T.C. Memo. 1993-34; Estate of Mueller v. Commissioner, T.C. Memo. 1992-284. In these cases, we noted the following passage from section 7 of Rev. Rul. 59-60: Because valuations cannot be made on the basis of a prescribed formula, there is no means whereby the various applicable factors in a particular case can be assigned mathematical weights in deriving the fair market value. For this reason, no useful purpose is served *618 by taking an average of several factors (for example, book value, capitalized earnings and capitalized dividends) and basing the valuation on the result. Such a process excludes active consideration of other pertinent factors, and the end result cannot be supported by a realistic application of the significant facts in the case except by mere chance. [1959-1 C.B. at 243.]
The above reasoning is applicable here. We conclude that Dr. Sherman's combination of arbitrarily weighted figures for book value and historic earnings or cash flow does not produce a reliable estimate of the fair market value of the stock at issue in this case. Nor did petitioner's expert explain adequately his choice of the multiples he applied to the weighted average of historical earnings or cash flow figures. He selected a factor of 12 for Ford Van and Ford Moving, stating that that figure was based on the price-earnings multiple for publicly traded trucking companies. Certain circumstances suggest that use of such a multiple is inappropriate. With respect to Ford Van, it did not even engage in trucking; it merely leased its cars, trucks, tractors, and trailers *619 to Ford Moving for use in the latter's transfer and storage business. At trial, petitioner's expert acknowledged that Ford Van was a holding company. With respect to Ford Moving, a substantial portion of its earnings was attributable to nonoperating assets; as discussed below, those earnings should not be treated as if they were earned from trucking operations. With respect to Ford Mercantile, Ford Real Estate, and Ford Dodge (the three companies which owned real estate), petitioner's expert selected a capitalization rate of 10 percent, explaining, without supporting data or explanation, that that rate was appropriate for the Omaha area. Estimates and assumptions not supported by independent evidence or verification are of little assistance to the Court and will not be accepted as probative of value. Rose v. Commissioner, 88 T.C. 386, 418 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Parker v. Commissioner, 86 T.C. at 564. We do not accept as probative expert opinions which are based on speculation. Estate of Gordon v. Commissioner, 70 T.C. 404, 412-414 (1978); *620 Royce C. McDougal, M.D., Inc. v. Commissioner, T.C. Memo. 1985-64; see also Klapmeier v. Telecheck International, Inc., 482 F.2d 247, 252 (8th Cir. 1973). An expert's opinion is of little or no value unless it is supported by disclosed facts. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Casey v. Commissioner, 38 T.C. at 381. Accordingly, we do not accept the multiplication factors selected by petitioner's expert as probative of the value of the stock at issue. In addition to using a formula which understated the contribution made by each of the Ford companies' assets to the total fair market value of the stock of each such company, petitioner's expert valued the assets of each company using unadjusted book value, thereby undervaluing the assets themselves. Petitioner's expert generally used historic book value as a factor in his formula, notwithstanding that petitioner had obtained appraisals as of the valuation date for certain of the Ford companies' assets, namely, the real estate owned *621 by Ford Mercantile and Ford Dodge, the securities issued by unrelated entities that were owned by Ford Mercantile, Ford Dodge, Ford Real Estate, and Ford Moving, as well as the cars, trucks, trailers, and securities issued by unrelated entities that were owned by Ford Van. [11]
Petitioner's expert did not attempt to show that book value was superior as an indicator of the value of each of the Ford companies' assets to the appraisals of fair market value obtained by petitioner. In fact, he acknowledged that book value might not reflect an asset's fair market value at a particular valuation date. Nonetheless, petitioner's expert made no adjustments to the book values of the assets *622 of the Ford companies to bring them into line with their fair market values. We find that Dr. Sherman's use of historic book value instead of fair market value as of the date of decedent's death resulted in undervaluation of the assets of the Ford companies and that therefore petitioner's expert undervalued decedent's stockholdings in each of those companies on that date. We have previously noted that "unadjusted book values are often unreliable for valuation purposes because they may have little relation to the assets' fair market values at the date of valuation." Estate of Andrews v. Commissioner, 79 T.C. at 948 n.16. See Gulf, Mobile & Ohio R. Co. v. United States, 579 F.2d 892, 897 (5th Cir. 1978). Concerns as to the use of book values are especially appropriate here, since many of the assets, such as the warehouses, had been held for many years as of the valuation date, and their historical cost, less depreciation, was not indicative of their fair market value as of that date. The schedules prepared by respondent's expert comparing the book value of the assets of the Ford companies to their appraised values as *623 of the date of decedent's death make this disparity readily apparent. We conclude that the fair market values of the assets, rather than unadjusted book values, would have been considered more important by a hypothetical willing buyer and willing seller in arriving at the fair market value of the stock at issue on the valuation date. Consequently, in view of the substantial discrepancies between book value and appraised value, we do not accept the use by petitioner's expert of the book value of the Ford companies' assets in arriving at his valuation of that stock. See Dellacroce v. Commissioner, 83 T.C. 269, 291 (1984). We also note that petitioner's expert applied a non-marketability discount of 33 percent to decedent's stockholdings in each of the Ford companies. He also applied a minority interest discount of seven percent to decedent's stockholdings in each of those companies in which decedent did not own greater than 50 percent of the outstanding stock on the valuation date (namely, Ford Mercantile, Ford Real Estate, and Ford Dodge). We have previously defined these types of discounts as follows: The minority shareholder discount is designed *624 to reflect the decreased value of shares that do not convey control of a closely held corporation. The lack of marketability discount, on the other hand, is designed to reflect the fact that there is no ready market for shares in a closely held corporation. * * * [Estate of Andrews v. Commissioner, 79 T.C. at 953.]
Petitioner's expert did not explain how he arrived at the discount figures he utilized. He merely stated that they were warranted because selling the Ford companies' stock would be difficult and because a minority stockholder could not control the liquidity of his investment. Petitioner's expert affords us no basis for evaluating the reasonableness of the discount figures he used. Even if he selected the figures based on his experience, petitioner's expert should have disclosed the process by which he arrived at his conclusions. Petitioner's expert therefore affords us no grounds upon which to decide whether a hypothetical willing buyer and willing seller would have applied discounts of the magnitude he employed in bargaining over the stock at issue. Consequently, we find both of the discount figures utilized by petitioner's expert *625 to be of no assistance to the Court in valuing the stock at issue. Based on the record herein, we find that the report of petitioner's expert is seriously flawed as illustrated above and that it therefore is not probative of the fair market value of the stock at issue. Consequently, we will not rely on petitioner's expert report in valuing the stock of each of the Ford companies. Tripp v. Commissioner, 337 F.2d at 434; Estate of Newhouse v. Commissioner, 94 T.C. at 244; Parker v. Commissioner, 86 T.C. at 564-565. Respondent's Expert Report
Respondent submitted an expert report in support of her determination of the fair market value on the valuation date of petitioner's stock in each of the Ford companies. We turn now to that report. Preliminarily, we note that, even if we reject the expert report of one party, we are not required to accord the valuation of the other party total or even partial acceptance. See Palmer v. Commissioner, 523 F.2d at 1310; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Where *626 a party has clearly shown to our satisfaction a significant error in the expert opinion we find more persuasive, appropriate adjustments will be made. Estate of Gilford v. Commissioner, supra.Accordingly, we will consider petitioner's objections to the method employed by respondent's expert in the course of reviewing that expert's report. Respondent's expert report was prepared by Patrick K. Schmidt, William C. Herber, and Robert J. Strachota, MAI, all of whom are employed by the Shenehon Company (respondent's expert), a real estate and business appraisal firm. The authors of respondent's expert report are professional appraisers. Consistent with the applicable standards of their profession, their report sets forth the analysis and data underlying their conclusions. Respondent's expert took into account the factors listed in Rev. Rul. 59-60, 1959-1 C.B. 237, in valuing the stock of each of the five Ford companies. Thus, for each of those companies, respondent's expert reviewed the nature and history of its business, general economic and industry outlook, historic financial condition, earning capacity, *627 dividend-paying capacity, goodwill, sales of the stock, size of the stockholding valued, and market prices of comparable actively traded companies. Valuation of Ford Mercantile, Ford Dodge, Ford Real Estate, and Ford Van
After examining the assets and considering the nature of four of the companies -- Ford Mercantile, Ford Real Estate, Ford Dodge, and Ford Van -- respondent's expert concluded they are holding companies. Petitioner's expert did not disagree with this conclusion, having acknowledged at trial that they are holding companies. Hereinafter, those four companies will collectively be referred to as holding companies. Each of the holding companies' assets consisted of real estate or equipment, cash, marketable securities, stock in Ford Mercantile, and amounts due from related entities. Virtually all of the income of each such company consisted of rents and interest income from marketable securities and, in the case of Ford Van, proceeds of asset sales. Respondent's expert found no operational aspects in any of the holding companies, such as employees. Respondent's expert considered all of the factors listed in Rev. Rul. 59-60, *628 but, based on the characteristics of each holding company, respondent's expert concluded that the most important factor in determining the fair market value of the stock of Ford Mercantile, Ford Real Estate, Ford Dodge, and Ford Van was the fair market value of each of those company's assets, less its liabilities. In this regard, we note that each factor listed in Rev. Rul. 59-60 does not necessarily have a bearing on value and need not be given weight in every case. Estate of Lee v. Commissioner, 69 T.C. 860, 869-870 (1978); Estate of Gallo v. Commissioner, T.C. Memo. 1985-363. Because respondent's expert found that a potential buyer of the stock of each holding company would be primarily seeking the long-term appreciation of each such company's assets and a vested interest in the entity associated with those assets, respondent's expert concluded that earnings and dividend-paying capacity were not probative of the value of the stock of the holding companies. There is no dispute as to the fair market value of (1) the real properties owned by Ford Mercantile, Ford Dodge, and *629 Ford Real Estate, (2) the cars, trucks, tractors, and trailers owned by Ford Van, or (3) the securities issued by unrelated entities owned by those four holding companies. To value the real estate owned by Ford Mercantile and Ford Dodge on the valuation date, respondent's expert relied upon an appraisal report prepared for petitioner by Joseph D. Yager, MAI, of Otis & Associates, an experienced real estate appraiser. Mr. Yager valued the real estate principally on the basis of market sales of comparable properties. In valuing the real estate owned by Ford Real Estate on the valuation date, respondent's expert relied upon the sale of its one warehouse property in July 1988, approximately three months after the date of decedent's death. To value the cars, trucks, tractors, and trailers owned by Ford Van on the valuation date, respondent's expert relied on valuations furnished petitioner by local equipment dealers. To value the securities issued by unrelated entities held by each of the four holding companies on the valuation date, respondent's expert relied upon representations by petitioner as to their fair market value as of that date. Other assets of the holding companies, such *630 as amounts due from related companies, were valued by respondent's expert at their face value. Respondent's expert valued the stock owned by each of the holding companies in Ford Mercantile as of the valuation date by multiplying the fair market value of Ford Mercantile's net asset value by the percentage of Ford Mercantile stock held by each such company. The following table summarizes as of the valuation date the stockholdings of Ford Dodge, Ford Real Estate, and Ford Van in Ford Mercantile and the value assigned each such stock interest by respondent's expert: Percentage Interest
Value of Such Interest
Company
in Ford Mercantile
in Ford Mercantile
Ford Dodge
20.94
$ 267,885
Ford Real Estate
9.53
121,917
Ford Van
14.70
188,057
Using the above-described asset-based method for valuing the stock of each of the holding companies, respondent's expert concluded that the fair market value on the valuation date of all of the stock outstanding in each such holding company was as follows: Company
Fair Market Value of Stock
Ford Mercantile
$ 1,279,298
Ford Real Estate
737,826
Ford Dodge
1,289,874
Ford Van
929,562
Petitioner finds fault with the use of *631 net asset values to value the stock of the holding companies, claiming that such method has been rejected by every court to which it has been presented. Petitioner is wrong. In prior cases, we and other courts have relied upon net asset values in determining the fair market value of interests in closely held entities. See, e.g., Hamm v. Commissioner, 325 F.2d at 941; Ward v. Commissioner, 87 T.C. 78, 102-104 (1986); Harwood v. Commissioner, 82 T.C. 239, 265-268 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Huntington v. Commissioner, 36 B.T.A. 698, 714-716 (1937); see also In re Nathan's Estate, 166 F.2d 422, 425-426 (9th Cir. 1948), affg. a Memorandum Opinion of this Court dated July 17, 1946; Bank of California v. Commissioner, 133 F.2d 428, 430-431 (9th Cir. 1943); Estate of Jephson v. Commissioner, 87 T.C. 297, 303-304 (1986); Estate of Piper v. Commissioner, 72 T.C. 1062, 1071 (1979); *632 Estate of Cruikshank v. Commissioner, 9 T.C. 162, 165 (1947). As we indicated above, net asset value generally is accorded the greatest weight in valuing the stock of a corporation where it is not an operating company and its activities are limited to the holding of real estate or other investments. [12]Levenson's Estate v. Commissioner, 282 F.2d at 586. In Rev. Rul. 59-60, it is stated that: The value of the stock of a closely held investment or real estate holding company * * * is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. * * * The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock, capitalized at rates deemed proper by the investing public at the date of appraisal. * * * For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company * * * than any of *633 the other customary yardsticks of appraisal, such as earnings and dividend paying capacity. [ Rev. Rul. 59-60, sec. 5(b), 1959-1 C.B. at 243.]
Petitioner appears to confuse the requirement that all factors be considered with the weight to be given each factor in a given situation. The cases relied upon by petitioner [13] appear to stand only for the proposition that other factors besides net asset value should be considered, but they do not prevent us from according the greatest weight to net asset value where it is appropriate to do so. *634 Here, respondent's expert report states that all the factors recited in Rev. Rul. 59-60, which we have noted above, were considered in valuing the stock of the Ford companies, including the four holding companies. The valuation report prepared by respondent's expert with respect to each of the holding companies contains information pertaining to those factors, indicating that this was done. Even though each factor should be, and was, considered by respondent's expert, every factor may not necessarily be entitled to be given weight under the circumstances of a particular case. Estate of Gallo v. Commissioner, T.C. Memo. 1985-363; see also Estate of Lee v. Commissioner, 69 T.C. at 869-870. At trial, Mr. Strachota, president of respondent's expert, testified that it is inappropriate to value a holding company on the basis of expected income because such companies are created to build up capital appreciation over time and de-emphasize regular cash flow. Respondent's expert also found that a potential buyer of the stock of each holding company would be principally concerned with *635 the value of the underlying assets and the potential appreciation of such assets and would not be concerned with short-term dividend-paying capacity. [14]Where a company is managed with a view to long-term appreciation of assets and not for current income or dividends, it is appropriate to give the greatest weight to net asset value, rather than to earnings, in valuing its stock. Hamm v. Commissioner, supra at 941. *636 Due to the nature of the holding companies and the goals of potential buyers of their stock, respondent's expert did not find other factors listed in Rev. Rul. 59-60, such as earning or dividend-paying capacity, as probative of fair market value as the net value of the underlying assets of each of the holding companies. At trial, Mr. Strachota testified that a valuation of each of the holding companies under an earnings approach had been performed, but that the resulting values had not been relied on because they undervalued the holding companies' stock and a potential buyer would not consider them determinative of value. The financial statements of the holding companies, and even petitioner's expert valuation of the holding companies, which was based primarily on their earnings and to a lesser extent on their assets' book value, show that the value of such earnings was significantly less than the net fair market value of their assets. Where the earnings approach understates the value of stock, we have given it correspondingly little weight. E.g., Ward v. Commissioner, 87 T.C. at 101-103. In deciding the *637 relative weight to be accorded net asset value and earnings in valuing a corporation, we will consider the extent to which the company is actively engaged in producing income as opposed to simply holding property for investment. Id. at 102-103. Where a corporation's assets consist of real estate, earnings are considered important where the corporation actively engages in a real estate management business. Estate of Andrews v. Commissioner, 79 T.C. at 944, 946. Where a corporation simply holds assets for investment and does not have active business operations, we have approved use of net asset value as a basis for valuing stock. Estate of Jephson v. Commissioner, 87 T.C. at 303-304; Estate of Piper v. Commissioner, 72 T.C. at 1071-1072. Moreover, even where a corporation has some minimal active business operations, we have relied on net asset value to value its stock. Estate of Lee v. Commissioner, 69 T.C. at 869-870 (asset value used as basis for valuation where assets consisted almost exclusively of undeveloped realty and *638 operating business accounted for less than five percent of assets). In the instant case, respondent's expert found no operational aspects in any of the Ford holding companies. We agree that the companies appear to be simply holders of investment property, engaging in no active business operations with respect to them. For instance, under the lease between Ford Mercantile and Ford Moving for the warehouse at 7402 L Street, Ford Moving agreed to pay for all taxes, insurance, utilities, and repairs on the building. The financial statements of the four holding companies do not show evidence of the active conduct of a business, such as is revealed on the statements of Ford Moving; they reflect only income and any expenses connected with holding property. If there are operational aspects to the four holding companies, petitioner has failed to demonstrate their existence. Moreover, even if such aspects existed, petitioner has failed to demonstrate the amount by which the stock values should be adjusted to take account of them. Accordingly, we accept the net asset value approach utilized by respondent's expert in valuing the stock of each of the four holding companies. Furthermore, *639 even if we were to accord weight to earnings, notwithstanding the absence of active business operations by any of the holding companies and the tremendous disparity between the value of each such company's earnings and the value of each such company's assets, we find that the effect of the earnings factor on the value of the stock of each of the holding companies would be slight at best. Under such circumstances, we have held that the effect of earnings on value may be adequately accounted for in the discounts we otherwise allow from the full value of the stock in issue. Ward v. Commissioner, supra at 103. We reach the same conclusion in the instant case and conclude that any impact which earnings might have had on the value of the stock of each of the holding companies on the valuation date may be adequately accounted for in the discounts we will allow from the full value of the stock in each such company as determined by respondent's expert and herein, as discussed below. Petitioner also argues that respondent's expert should have taken into account the cost of liquidating the assets of the four holding companies, including any taxes that would *640 be payable in connection with a liquidation. For purposes of valuing the stock of those companies, respondent's expert assumed that no liquidation would occur. Petitioner's expert valuation is based on the same assumption. That assumption was consistent with accepted practice, since the cost of liquidation, including taxes, is not taken into account for purposes of valuation where the prospect of liquidation is merely speculative. Ward v. Commissioner, 87 T.C. at 104; Estate of Piper v. Commissioner, 72 T.C. at 1086-1087; Estate of Cruikshank v. Commissioner, 9 T.C. at 165. Petitioner has pointed to no circumstances indicating that any of the holding companies would be liquidated. Consequently, no adjustment for any expenses associated with liquidation should be made in valuing any of those companies. Petitioner further claims that respondent's expert overvalued petitioner's stock in each of the holding companies, pointing out that publicly traded stocks in certain large, high quality companies paid substantial dividends, while the holding companies were of lower quality and paid no *641 dividends. Respondent contends on brief that the companies referred to by petitioner are not comparable to the holding companies at issue, as required by section 2031(b) and section 20.2031-2(f), Estate Tax Regs. Respondent argues that therefore they furnish no useful information concerning the valuation of the stock of each of the Ford holding companies. We agree with respondent that the companies to which petitioner would compare the holding companies are large public utilities and industrial concerns which are completely unlike those holding companies. Moreover, respondent's expert did consider the applicability of dividend yields in valuing the stock of each of the holding companies, but concluded that that factor would not affect its value. Respondent's expert found that a prospective buyer of the stock in each of the holding companies would be principally interested in long-term appreciation of assets, not short-term dividend-paying capacity. Petitioner also suggests that the cash flows of certain large, high quality companies are superior to those of the Ford holding companies. However, that fact would not be important to a prospective investor principally interested *642 in long-term appreciation of assets, rather than current earnings. While stock in the type of company on which petitioner relies as a basis of comparison is within the universe of possible investments available to a prospective purchaser of stock in each of the holding companies, such circumstance does not, in our view, establish that a prospective purchaser of stock in each of the holding companies, who is principally interested in long-term appreciation, would pay less for petitioner's stock in each of those companies because current dividend yields are available elsewhere. Accordingly, on the record here, we do not find that respondent's expert overvalued petitioner's stockholdings in each of the holding companies on account of the dividend yields and cash flow of the publicly traded companies referred to by petitioner. Respondent's expert calculated the fair market value on the valuation date of petitioner's stock in each of the four holding companies as the percentage of each company's net asset value equal to petitioner's percentage equity interest in each such company, thereby resulting in the following value for petitioner's stock interest in each company before applying *643 discounts, if any: Petitioner's Percentage
Undiscounted Value
Company
Interest in Company
of Such Interest
Ford Mercantile
6.86
$  87,760
Ford Real Estate
36.41
268,642
Ford Dodge
41.42
534,266
Ford Van
92.41
859,008
With respect to petitioner's stock in Ford Real Estate and Ford Dodge, respondent's expert applied a minority interest discount of 20 percent to the value so determined and a further discount of 10 percent for lack of marketability. In contrast to petitioner's expert, respondent's expert explained how these discounts were derived and set forth the factors considered in selecting them. We find application of these discounts to be warranted based on petitioner's minority position in each of those two companies and the absence of a ready market for each such company's shares. Respondent's expert thus determined, and we conclude, that on the valuation date the fair market value of (1) petitioner's 36.41 percent stock interest in Ford Real Estate was $ 193,423 and (2) its 41.42 percent stock interest in Ford Dodge was $ 384,671. Respondent's expert allowed no discounts to its previously determined value of $ 859,008 for petitioner's 92.41 percent *644 stock interest in Ford Van on the ground that petitioner had a controlling position in that stock. [15] We have, however, found in other cases that a control position in a closely held company does not obviate the difficulty of disposing of stock for which there is no ready market. Estate of Andrews v. Commissioner, 79 T.C. at 953; Estate of Bennett v. Commissioner, T.C. Memo. 1993-34. There is no suggestion in the record that a ready market for the shares of Ford Van existed on the valuation date, and we find that a seller of petitioner's stock in Ford Van would face the same difficulties as a seller of petitioner's stock in Ford Dodge and Ford Real Estate, with respect to which respondent's expert allowed a 10 percent marketability discount. Respondent's expert concluded that such a discount was appropriate in valuing the stock of those two companies, given the size of the interests valued, the quality of the companies, and the relations among shareholders. Based on our consideration of such factors, we conclude that 10 percent is the appropriate amount of discount required to reflect the diminution in value of petitioner's *645 holding of Ford Van attributable to its lack of marketability. Respondent's expert also did not apply any discount for minority interest or lack of marketability to its previously determined value of $ 87,760 for petitioner's 6.86 percent stock interest in Ford Mercantile on the ground that petitioner indirectly controlled [16] *646 a majority of Ford Mercantile's stock through its control of Ford Van and Ford Moving. [17] In deciding not to apply any discounts, respondent's expert assumed that petitioner's stock in each of the Ford companies would be sold as a block so as to maximize the value of that stock (block sale assumption). *647 Respondent's expert thus did not believe any discounts were warranted where petitioner had effective control of Ford Mercantile by virtue of his control of Ford Van and Ford Moving, which together owned over 50 percent of Ford Mercantile's stock on the valuation date. Mr. Strachota, president of respondent's expert, testified that, in his opinion, a prudent seller would sell the 6.86 percent interest in Ford Mercantile in a manner which would enable realization of its full, undiscounted value. Petitioner argues that the assumption of a sale on such terms caused respondent's expert valuation of the Ford companies to have been made on such a narrow basis so as to undermine totally respondent's expert's opinion of the value of that stock. Pointing to a statement in respondent's expert report that the valuation of each Ford company is not to be used separately, petitioner argues that respondent's expert valuation is usable only if it is assumed that petitioner's stock in all of the Ford companies would be sold to one buyer. We disagree. At trial, Mr. Strachota explained that respondent's expert based its block sale assumption on the interrelationship of petitioner's stockholdings, *648 and not on the business relationships of the companies. He further testified that the statement in respondent's expert report referred to by petitioner was designed simply to call attention to the fact that a control position in Ford Mercantile existed due to the interrelationship of petitioner's stockholdings in the Ford companies. Mr. Strachota further indicated that the valuation of petitioner's stock would not be invalidated if the block sale assumption were to be changed and that the only consequence of changing the block sale assumption would be to discount the value of petitioner's direct holding of Ford Mercantile stock for minority interest and lack of marketability. We are not prepared to reject entirely respondent's block sale assumption. However, it seems to us that a block sale of petitioner's stock would occur, if at all, on the basis of not only the interrelationship of petitioner's stockholdings, but also the business relationships of the Ford companies. A buyer of all petitioner's stock in the Ford companies would acquire interests in companies which enjoyed a set of established arrangements necessary for Ford Moving to conduct a transfer and storage business. *649 It also appears that a buyer of Ford Moving's stock would be particularly desirous of acquiring petitioner's 92.41 percent interest in Ford Van, since that company held the Allied Van Lines agency agreement and the Department of Defense contract, which were of importance to the household goods transfer and storage division of Ford Moving. In valuing Ford Moving, respondent's expert appears to have assumed that use of Ford Van's contracts would continue. We are not prepared, however, to accept the block sale assumption of respondent's expert as applied to petitioner's 6.86 percent interest in Ford Mercantile. There seems to be no business reason why a prospective purchaser of any of the other Ford companies would desire to acquire petitioner's stock in Ford Mercantile as well. The record shows that each of the Ford companies generally dealt with Ford Mercantile at arm's length. Respondent's expert report notes that Ford Moving paid a market rent for the warehouse space leased from Ford Mercantile. Furthermore, Ford Moving had leased Ford Mercantile's warehouse at 7402 L Street for an eight-year term beginning January 1, 1987. Thus, Ford Moving's continued occupancy of the premises *650 did not depend on maintaining control of Ford Mercantile. [18] Moreover, in the event of a block sale of Ford Moving and Ford Van, the purchaser would acquire a 50.89 percent of the stock of Ford Mercantile, rendering acquisition of petitioner's direct 6.86 percent interest unnecessary for control. The only reason respondent's expert has advanced for its block sale assumption is that a prudent seller would wish to sell petitioner's stock in the Ford companies as a block because such a sale would maximize the value of petitioner's direct stockholding in Ford Mercantile. We have previously held that calculating value based on the highest possible price which a seller wishes to obtain skews the result and that the calculation must be tempered by what the buyer would pay. Buse v. Commissioner, 71 T.C. 1129, 1137 n.1 (1979); see also Estate of Jephson v. Commissioner, 87 T.C. at 303. In estimating value under the willing buyer-willing seller test, "the highest price a willing buyer would pay is also the price that a willing seller wants." Estate of Newhouse v. Commissioner, 94 T.C. at 233 n.23. *651 We cannot conclude on the instant record that a willing buyer would pay petitioner the undiscounted value of its Ford Mercantile stock simply because a prudent seller would seek that price. Our refusal to accept the block sale assumption as applied to Ford Mercantile made by respondent's expert does not seriously impair the usefulness of its estimate of the fair market value of the stock at issue in each of the Ford companies. Where an expert's opinion rests on faulty assumptions, we may still be able to construct reliable estimates of value by adjusting for such assumptions. See Anselmo v. Commissioner, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). *652 Mr. Strachota testified that, were petitioner's direct stock ownership in Ford Mercantile to be sold separately, a 20 percent discount for a minority interest and a 10 percent discount for lack of marketability should be allowed in valuing that interest. [19] We thus will allow a reduction in the value on the valuation date of petitioner's stock interest in Ford Mercantile so as to take account of a 20 percent discount for a minority interest and a 10 percent discount for lack of marketability. We note that, aside from urging us to accept the discounts for minority interest and lack of marketability offered by Dr. Sherman, which we have declined to do, petitioner does not seek any further adjustments in the discounts allowed by respondent's expert with respect *653 to petitioner's stockholdings in the Ford holding companies. Accordingly, we will make no adjustments in those discounts other than as stated above. Valuation of Ford Moving
Having valued the stock of each of the holding companies, respondent's expert proceeded to value the stock of the last remaining Ford company, Ford Moving. Respondent's expert valued the stock of Ford Moving based on a consideration of the factors enumerated in Rev. Rul. 59-60. After examining its assets and manner of operation, respondent's expert concluded that a significant portion of Ford Moving's assets were not required for its transfer and storage business and that the company should be valued as a blend of an operating company and a holding company. According to respondent's expert, analysis of Ford Moving's financial position using various ratios and industry norms indicated that the company had excessive levels of nonoperating assets. Petitioner argues that those assets were being held for future use in obtaining modern warehouse facilities and therefore were required for Ford Moving's business. However, whatever Ford Moving's future plans might have *654 been for such assets, [20] we conclude that respondent's expert was justified in determining that they were not being used in the operating business on the valuation date. Pursuant to its conclusion that Ford Moving was a blend of an operating company and a holding company, respondent's expert divided Ford Moving into two components for valuation purposes. It thus separated the nonoperating assets from the operating assets and determined the fair market value on the valuation date of those nonoperating assets. We have in the past accepted such a division of a company into operating and investment components for valuation purposes. Gallun v. Commissioner, T.C. Memo. 1974-284. The nonoperating assets of Ford Moving consisted of marketable securities, its 36.19 percent stock interest in Ford Mercantile, amounts due from stockholders (stockholder account), and cash *655 in excess of industry norms as determined by respondent's expert. The marketable securities were valued using values provided by petitioner, and there is no dispute as to these values. The stock of Ford Mercantile was valued by taking a pro rata share of respondent's expert valuation of the assets of that corporation, without allowance of any discounts. The figure for stockholder account was taken from Ford Moving's balance sheet. Respondent's expert thus valued the nonoperating assets at $ 965,000, as follows: Asset
Fair Market Value
Cash
$ 170,000
Marketable Securities
295,213
Stock in Ford Mercantile
462,978
Stockholder Account
37,610
Rounded Total Per
$ 965,000
Respondent's Expert
For the reasons set forth above in our discussion of the valuation of the four holding companies, we find appropriate, and accept, respondent's expert's asset-based valuation of the investment or holding component of Ford Moving. Respondent's expert then proceeded to value the portion of Ford Moving which operated the transfer and storage business. In valuing that component, respondent's expert considered the state of the national and local economies, the nature of the transfer *656 and storage industry, and the history of Ford Moving's business. The report of respondent's expert indicated that the national and local economic outlook at the valuation date was generally good. Respondent's expert also noted various trends in the transfer and storage industry, such as the increase in price competition due to deregulation, the rise in palletization of commercial goods, and the beginning of a decrease in demand for household moving services due to reductions in military personnel and white collar corporate employees. Nevertheless, based on an analysis of Ford Moving's financial statements using commonly accepted ratio tests, respondent's expert concluded that the company's overall financial position on the valuation date was excellent. With respect to the commercial division of Ford Moving's transfer and storage business, respondent's expert indicated that the trend to store and transport commercial goods on pallets, which can be stacked high and moved by forklifts, rendered obsolete old, multistory warehouses and required the industry to invest in single story, high-ceilinged warehouses. Respondent's expert observed that Ford Moving, having relocated before *657 the valuation date its commercial division to the large, single story warehouse at 7402 L Street, which it leased from Ford Mercantile, was acting to remain competitive in the industry. With respect to the household goods division of Ford Moving, respondent's expert indicated that, through its performance of the Allied Van Lines agency agreement held by Ford Van, Ford Moving was able to offer nationwide moving services. Respondent's expert found that, in 1988, most of the household goods division's revenue came from long-distance moving services and only a relatively small percentage was attributable to storage of goods. Respondent's expert also noted that, due to the longer period of time household goods were stored, efficiency was not as important as in commercial warehousing and that consequently multistory warehouses were still adequate for storage of household goods. In valuing the operating portion of Ford Moving, respondent's expert developed values under three major valuation approaches: the asset value method, the discounted cash flow method, and the market comparable method. The asset value method arrives at a value for a business by adding the tangible net worth of *658 a company, based on the market value of the tangible assets, to the goodwill value resulting from capitalizing excess earnings. Excess earnings are calculated by subtracting economic depreciation on tangible assets and return on invested capital from estimated before-tax earnings. Earnings estimates are developed from historical information and an assessment of a company's future. A capitalization rate is then applied to excess earnings to yield a value for goodwill. [21] The capitalization rates selected take into account the illiquidity of Ford Moving's stock. Thus, a discount for lack of marketability is built into the valuation produced under the asset value method. Long-term debt is deducted from total asset value to yield net asset value on the valuation date. Under this method, respondent's expert estimated the value of the operating portion of Ford Moving to be $ 240,000. *659 Under the discounted cash flow method -- the second method under which respondent's expert developed a value for the operating component of Ford Moving -- future years' earnings over a certain period are estimated using historical data and an assessment of future prospects, with the cost of replacements being deducted to yield actual projected cash flow in each such year. A selected discount rate is then applied to each year's projected cash flow. The discount rate selected takes into account the illiquidity of Ford Moving's stock. Thus, a discount for lack of marketability is built into the valuation produced under the discounted cash flow method. The discounted cash flow projected for each year is totaled to produce the present value of future earnings for the projected period. The present value of estimated residual value of the business at the end of the projected period is added to yield the total present value of the business. Long-term debt outstanding on the valuation date is subtracted from the total present value of future cash flow to yield the net present value of that flow. Using the discounted cash flow method, respondent's expert estimated the value of the operating *660 portion of Ford Moving at $ 210,000. The third method -- the market comparable method -- used by respondent's expert arrives at an estimate of value based on the market price of actively traded stocks of companies comparable to the one being valued. Respondent's expert developed a list of publicly traded companies comparable to Ford Moving based on characteristics such as size, profitability, financial condition, growth rate, and quality of earnings. Respondent's expert also examined information on sales of comparable companies from a confidential small business data exchange. From this market data, the factors to be used in various ratios used to calculate stock value, such as the price earnings ratio, were developed. Applying those ratios to financial information for Ford Moving, and allowing for a 35 percent control premium and 25 percent lack of marketability discount, respondent's expert estimated the value of the operating portion of Ford Moving at $ 230,000. Having developed different values under different approaches for the operating portion of Ford Moving, respondent's expert added to each such value the value it determined for Ford Moving's nonoperating assets, namely, *661 $ 965,000, in order to produce a fair market value for all of its stock under each method. The various estimates of value reached under the foregoing methods are summarized in the following table: Value of Operating
Total Value of Outstanding
Method
Portion of Ford Moving
Ford Moving Stock
Asset Value
$ 240,000
$ 1,205,000
Discounted
Cash Flow
210,000
1,175,000
Market Comparable
230,000
1,195,000
Respondent's expert then compared the estimates of value and determined the weight to be given each. Respondent's expert concluded that the asset value method and discounted cash flow method produced the most reliable indications of value, and therefore it placed considerable weight on those approaches. Respondent's expert accorded the least weight to the market comparable approach because the similarities between Ford Moving and the comparables found were limited. After considering all indicators of value, respondent's expert concluded that on the valuation date the value of all the stock in Ford Moving was $ 1,200,000. Respondent's expert then valued decedent's 74.56 percent interest in Ford Moving at $ 894,720, representing a pro rata share of the company's *662 total value. Since petitioner held a majority of the stock in Ford Moving, respondent's expert did not allow any discount for a minority interest. Respondent's expert also concluded that no further discount needed to be taken into account in valuing petitioner's Ford Moving stock because any applicable discount for lack of marketability had been factored into the process of estimating the value of the operating portion of Ford Moving under the asset value, discounted cash flow, and market comparable approaches. Respondent's expert did not expressly state whether this lack of marketability discount was intended to apply to both the operating and nonoperating portions of Ford Moving. The discount allowed by respondent's expert with respect to Ford Moving was applied only to the value of the operating portion of the company. Respondent's expert did not discuss whether a lack of marketability discount was allowable with respect to the nonoperating portion of Ford Moving. We note that, in valuing petitioner's majority interest in Ford Van, respondent's expert stated that no such discount should be taken into account in valuing a controlling interest in a holding company. It appears *663 to us that respondent's expert has applied that assumption here and has allowed no lack of marketability discount with respect to the value of the nonoperating portion of Ford Moving, which respondent's expert valued as if it were a holding company. As noted in our discussion of the valuation of petitioner's Ford Van stock, a lack of marketability discount may be allowed even where a controlling interest is being valued. The discount allowed in valuing the operating portion of Ford Moving is inadequate to reflect the reduction in value of the combined operating and nonoperating portions of Ford Moving due to the lack of marketability of that company's stock. Respondent's expert has concluded that a 10 percent discount is required to reflect the diminution in the value of petitioner's stock in certain of the Ford holding companies due to the lack of a ready market for their stock. We will accordingly allow a 10 percent discount from the value of the nonoperating assets of Ford Moving in order to take into account fully the effect of lack of marketability on the value of petitioner's stock in that company. Petitioner objects that respondent's expert overvalued the operating portion *664 of Ford Moving by failing to consider adequately the effect of the loss of the Honda account on the company's prospects. Petitioner notes that this account represented a substantial portion of Ford Moving's business and that income generated from it made the difference between profit and loss in the years preceding decedent's death. Contrary to petitioner's assertion, in valuing Ford Moving, respondent's expert did note the adverse impact on Ford Moving's value resulting from its dependence on large customers such as Honda and Kellogg. Respondent's expert therefore projected that revenue would fall somewhat in 1989, the year following the termination of the Honda account. Respondent's expert, however, concluded that the business would be slowly replaced. We agree with respondent's expert's conclusion that the Honda business would be replaced. We note that Honda's letter to Ford Moving concerning the termination of the account makes clear that Honda expected Ford Moving to find replacement customers who would offset Honda's obligation to make lease payments on the space formerly used to store Honda products. Furthermore, Ford Moving's commercial division enjoyed the benefit *665 of experienced management, being headed by decedent's son, Jack Ford, who had over 40 years' experience with the company. [22] In addition, respondent's expert pointed out, and we find it significant, that revenues actually increased in 1989 and 1990, showing that Ford Moving had already recovered from the loss of the Honda account. We note that, while property is to be valued on the basis of the situation existing on the valuation date, subsequent events may be considered in assessing the reasonableness of expectations for the future as of that date. Estate of Gilford v. Commissioner, 88 T.C. at 52-53. We believe that the loss of the Honda account did not adversely affect the value of Ford Moving's stock on the valuation date to the extent contended by petitioner. We therefore find respondent's expert valuation of the stock of Ford Moving to be reliable and persuasive. Accordingly, we accept that value here, except as modified above. *666 We have considered petitioner's other objections to the report of respondent's expert and find that they lack merit. Conclusion
Based on our consideration of the entire record in the instant case, we conclude that, with the exceptions noted above, the opinion of respondent's expert of the fair market value of the stock at issue in each of the five Ford companies is probative and persuasive. In contrast, we find the opinion of petitioner's expert to be of no probative value in this case. Accordingly, except as modified by the foregoing discussion, we hold that the opinion of respondent's expert accurately reflects the fair market value of decedent's stock in each of the Ford companies as of the date of his death. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The report prepared by respondent's expert arrived at a somewhat higher aggregate value for the stock at issue than used by respondent in preparing the notice of deficiency (the notice). Although respondent has modified her determination to reflect the evidence of value received at trial, she has not sought to increase the amount of the deficiency. Accordingly, the Court will not enter a decision in excess of the deficiency determined in the notice. Sec. 6214(a); Pallottini v. Commissioner, 90 T.C. 498, 500 (1988); Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), affd. 738 F.2d 67 (2d Cir. 1984); see Guaranty Trust Co. of New York, Executor v. Commissioner, 31 B.T.A. 19, 23 (1934), affd. per curiam 76 F.2d 1010↩ (2d Cir. 1935).
2. Respondent made certain other adjustments in the statutory notice of deficiency, increasing the assets of the estate by $ 5,117 and increasing expenses allowed by $ 9,000 for administrative expenses and by $ 1,187 for Federal income taxes due from decedent. These adjustments had been reported by petitioner on an amended estate tax return. Petitioner conceded the increase in assets and the amount of additional Federal income tax expense. Petitioner also conceded the amount of the administrative expense increase determined by respondent, reserving the right to claim certain additional items of expense and interest.↩
3. The building at 7402 L Street had been purchased for $ 1,800,000 and financed by $ 300,000 in loans from related companies and a mortgage of $ 1,350,000 which was guaranteed by Ford Dodge and R.A. Ford-Douglas Real Estate Co. (Ford Douglas).↩
4. Although sec. 2032 permits taxpayers to elect an alternate valuation date, petitioner did not make such an election.↩
5. All section references are to the Internal Revenue Code in effect at the date of decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
6. Although the stock that was the subject of the gifts was valued for Federal gift tax purposes, we are not inclined to attach any weight to those valuations. In the case of gifts made within three years of decedent's death, the value assigned the stock resulted in a value of each gift of under $ 10,000, the annual exclusion amount. Sec. 2503(b). Consequently, we regard those values as at best a floor.↩
7. In some situations, however, the peculiar nature of a corporation may preclude reference to listed securities. Estate of Lee v. Commissioner, 69 T.C. 860, 869↩ (1978).
8. We note that revenue rulings are not generally regarded as precedent in this Court, but we will take into account the principles set forth in Rev. Rul. 59-60, 1959-1 C.B. 237, to the extent they represent a correct approach to the valuation of property. See Stark v. Commissioner, 86 T.C. 243, 250-251↩ (1986).
9. We note that the valuation of decedent's stock in Ford Moving in the notice of deficiency was less than that found by respondent's expert. As discussed below, respondent's expert provided cogent evidence of the value of the stock of that company, and we have accepted that expert's opinion of value, with only minor modifications.↩
10. In his explanation of the formula used for Ford Moving and Ford Van, petitioner's expert erroneously stated in his report that the applicable factor was 10, but he testified at trial that he used the factor of 12 in his actual calculations.↩
11. Petitioner's expert acknowledged at trial that he was aware that the appraisals of real estate, trucks, and trailers had been obtained by petitioner. Although he was unaware that the securities issued by unrelated entities that were owned by the Ford companies had been appraised, he did not attempt to ascertain their fair market values.↩
12. We are, however, not bound by any hard-and-fast rule in any given situation. Rather, we will consider all factors, giving weight to those which we find affect value.↩
13. Cases cited by petitioner are Estate of Cotchett v. Commissioner, T.C. Memo. 1974-31; Estate of Smith v. Commissioner, a Memorandum Opinion of this Court dated Oct. 17, 1950; Goss v. Fitzpatrick, 97 F. Supp. 765 (D. Conn. 1951); Blackard v. Jones, 62 F. Supp. 234↩ (W.D. Okla. 1944).
14. The record shows that a substantial portion of the assets of the holding companies was of a type which would appeal to an investor interested in a long-term, rather than current, return. For instance, Mr. Yager's appraisals of the warehouse properties noted that there was no market for the older buildings as income-producing investments, while the newer buildings were not of the type generally held by investors seeking returns from rentals. Furthermore, three of the holding companies held stock in Ford Mercantile, which, like the other Ford companies, paid no dividends. Moreover, even if certain assets of the holding companies might not be expected to appreciate, an asset-based valuation approach is still valid due to the absence of active business operations by the holding companies. Under such circumstances, their assets are the only things of value which the holding companies possess.↩
15. Respondent's expert did not base its decision not to allow a lack of marketability discount on the liquidity of Ford Van's assets. Accordingly, we conclude that Ford Van's ownership of certain liquid assets does not preclude allowance of a non-marketability discount in the instant case.↩
16. Respondent's expert concluded that petitioner had indirect control over Ford Mercantile based on petitioner's control over Ford Van and Ford Moving. Ford Van owned 14.70 percent of Ford Mercantile, and Ford Moving owned 36.19 percent of Ford Mercantile, giving petitioner indirect control of 50.89 percent of Ford Mercantile's stock. When such interests are combined with petitioner's 6.86 percent direct interest in Ford Mercantile, respondent's expert concluded that petitioner controlled 57.75 percent of Ford Mercantile's shares.↩
17. In addition, in valuing the stock of the Ford companies that held Ford Mercantile stock, respondent's expert did not allow any discount for minority interest or lack of marketability with respect to each such company's holdings of Ford Mercantile stock, even though each company's holdings of Ford Mercantile stock was a minority interest. Respondent's expert reasoned that such discounts were unnecessary due to petitioner's indirect control over Ford Mercantile. As we note below, we do not find that a seller would necessarily be able to sell petitioner's stockholdings in such a way as to realize the undiscounted value of the Ford Mercantile stock. Petitioner, however, has not requested that such discounts be allowed in valuing the stock of the companies holding Ford Mercantile stock, and we have generally been unwilling to allow "second stage" discounts, reasoning that any discount in value attributable to such factors is adequately reflected in the discounts allowed in valuing the stock of related companies at issue. Martin v. Commissioner, T.C. Memo. 1985-424; Estate of O'Connell v. Commissioner, T.C. Memo. 1978-191, affd. in part and revd. in part without discussion of this issue 640 F.2d 249↩ (9th Cir. 1981). We will accordingly not allow any discounts for purposes of valuing the Ford Mercantile stock held by the other Ford companies.
18. Although the mortgagee of this warehouse had demanded financial statements (Ford Moving, Ford Dodge, Ford Douglas) and guarantees (Ford Dodge, Ford Douglas) of companies other than Ford Mercantile before making the mortgage loan, it was not a condition of that loan that the companies remain under common control.↩
19. Although Mr. Strachota's testimony with respect to the appropriate amount of each discount is somewhat ambiguous, we interpret it to be consistent with the discounts allowed by respondent's expert with respect to the stock of Ford Dodge and Ford Real Estate.↩
20. We note that the record is devoid of any evidence showing what future plans might have existed on the valuation date.↩
21. In valuing the assets of Ford Moving, respondent's expert used the excess earnings approach to value goodwill. Under this approach, the component of income attributable to tangible assets is deducted from net income, and the remaining income is attributed to goodwill, which is then discounted to present value. See Rev. Rul. 68-609, 1968-2 C.B. 327↩, which describes the technique used. Although the excess earnings method has been criticized, most notably by respondent herself, see Pratt, Valuing a Business, 101-106 (2d ed. 1989), because of the often arbitrary selection of the discount rates used, we find here that the discount rates used were sound. They were based on a study conducted by the Institute of Business Appraisers. Thus, we find the resulting valuation of excess earnings reliable.
22. Respondent's expert noted that decedent had limited involvement with the business during the five years preceding his death. Thus, decedent's death did not adversely affect the company's prospects.↩